**RAILEY v. RAILEY.**

No. 65929.

District Court of the United States for the District of Columbia.

Nov. 13, 1939.

Edmund D. Campbell, of Washington, D. C., for plaintiff.

Leonard A. Block, of Washington, D. C., for defendant.

MORRIS, Associate Justice.

The plaintiff, as administrator of the estate of Charles R. Railey, deceased, seeks by a bill of complaint to have a trust declared and to obtain certain other relief with the respect to an aggregate sum of $2,000, paid by the decedent to the defendant shortly before the decedent's death. The complaint alleges that the payment—first of the sum of $500, and the following day the sum of $1,500—was accomplished while the decedent was of unsound mind and, further, as a result of undue importunities and undue influence exercised upon the decedent by the defendant.

The answer of the defendant avers that the sums of money mentioned in the bill of complaint were gifts by the decedent to the defendant, and that the decedent at the time of making such gifts was of sound mind, and that no undue importunities or undue influence was exercised by the defendant.

Of the $2,000 in question, the sum of $415 was paid by the defendant to cover the funeral expenses of the decedent, and this fact is shown by both the complaint and the answer. Upon the asking of the plaintiff, receivers were appointed to hold that part of the moneys so given by the decedent to the defendant and still remaining in his hands, which amounts to $550, and the receivers now hold that sum, pending the final determination of this cause. It further appears from the allegations of the bill of complaint that, prior to the gifts made by the decedent to the defendant, the decedent had on deposit with the Perpetual Building Association of Washington, D. C., the sum of $2,995.34, out of which said aggregate sum of $2,000 was paid to the defendant, and that the said sum of $2,995.34 represented the entire estate of the decedent with the exception of personal effects and belongings of little value. The bill of complaint further shows that the heirs and next of kin surviving the decedent, who died intestate, on the 8th day of November, 1937, are his widow, Harriet E. Allen, and his four children, of whom the plaintiff-administrator is one.

The cause is now before the Court on final hearing.

The decedent became ill October 15, 1937. He was removed to the defendant's home where he was treated by physicians until his death on November 8, 1937. The physician attending him during the period critical to this case described his illness as a chronic valvular disease, and stated that on October 22d decedent's "condition was serious. Dropsy had set in his lower limbs, abdomen, hands and lower arms. He suffered considerable dyspepsia and complained of difficulty in breathing, insomnia, and extreme pain in the region of the heart." The physician stated that "death could be expected at any time."

Upon the evidence taken, it is clear that, on October 22, 1937, at the time the decedent signed an instrument showing the receipt of $500 withdrawn from his account in the Perpetual Building Association, and on which day said sum of money so withdrawn was given to the defendant, and on October 23, 1937, at which time the decedent signed an instrument showing receipt of $1,500 withdrawn from his account in the Perpetual Building Association, and on which day said sum of money so withdrawn was given to the defendant, decedent was of sound mind. This fact is not open to question in the light of the testimony of the physician who was attending him at this period. The defendant was the brother of the decedent. The defendant's son, nephew of the decedent, testified that his uncle requested him to obtain the nec-

essary forms of receipts so that he could make the withdrawals and give the money so withdrawn to decedent's brother, the defendant. The forms were procured; the defendant signed the same; and the money was turned over to the defendant. Several witnesses corroborated all of the essential elements of this gift. The nephew of the decedent testified that his uncle wanted to give this money to his father "so that he would have it in case anything happened." There is absolutely lacking any evidence tending to prove that there were any undue importunities or that any undue influence was brought to bear upon the decedent with respect to these gifts. Indeed the gifts are most natural ones in the light of the circumstances disclosed by the evidence. For a number of years the decedent had been estranged from his wife, and, while there is some evidence that he occasionally saw his sons, the relations with them were not close, while those with his brother were. The decedent lived alone and had left directions with the party from whom he rented his room that, in the event anything should happen to him, his brother, the defendant, should be notified. It was as a result of those directions that his brother was notified when the decedent became sick, and the defendant's wife went for the decedent and took him to the defendant's home where he remained until his death. The evidence shows that for a long period the decedent had habitually visited his brother on Sundays, and had given to the defendant financial help to the extent of his taxicab license fees and in other ways which assisted the defendant in the operation of his taxicab. It should be emphasized, however, that decedent lived frugally, withdrawing approximately $50 a month from the account which has been referred to for living expenses, and his gifts up until his last illness to his brother were very modest ones.

In these circumstances, one cannot say that the gifts complained of in the bill of complaint were gifts inter vivos. However, it is clear that the gifts were intended to be gifts causa mortis, intended by the decedent to be absolute and irrevocable in the event of his death during the illness with which he was afflicted at the time the gifts were made, and which unquestionably was the occasion for the gifts. It is difficult to believe that the decedent intended that the defendant should have such a very large part of his property irrevocably in the event the decedent should recover, as the decedent had no other means of supporting himself. It is clear, however, that he did desire the defendant, his brother, to have such property, as well as the means of paying the expenses of decedent's last illness and death, which otherwise the defendant did not have, in the event he should not recover. So the gifts in question cannot be set aside on the ground of either unsoundness of the donor's mind, or undue influence upon him.

It is well recognized that a gift causa mortis will not be permitted to defeat the claims of creditors of the decedent, and that any part of such gift necessary for the payment of debts must be surrendered. A gift causa mortis has characteristics of a gift inter vivos in that the delivery must be complete before the death of the donor. Such a gift, however, is similar to testamentary disposition in the respect that there remains with the donor the power to revoke the gift until his death and in the event he should escape the peril which prompted him to make the gift. It may be reasoned—on the theory that the actual title to the property passes to the donee prior to the death of the donor—that the donor was not seized and possessed of the property at the time of his death, and therefore a widow may not claim her share of her husband's personalty, inclusive of such gift, and in fact some jurisdictions do so hold. It would seem, however, that where both the motive for the gift and the power of revocation retained by the donor is so dependent upon and identified with death, as must be the case in gifts causa mortis, the policy of the law which gives to the widow a stated share in the husband's personal property, regardless of any testamentary action by him to dispose of it otherwise, would operate with like effect in so far as the rights of the widow are concerned. Our own Court of Appeals has considered a gift causa mortis to be in certain respects substantially similar to a testamentary gift. The rights of the heirs, other than the widow, however, do not stand on this footing; they have no statutory right to claim a share of the decedent's estate contrary to his disposition of it otherwise; nor is there any equitable consideration which would give rise to such a limitation.

In this case the aggregate amount of the personal property owned by the decedent, and including the amount of the gifts causa mortis, is $2,995.34. This

124

amount would be reduced by the expenses for the last illness and death of the decedent, amounting to $415, which would leave a balance of $2,580.34, so that the widow of the decedent, who died leaving a widow and children, would be entitled to a one-third share of the personalty after the payment of debts, which would, in this case, at most be $860.11. It, therefore, is apparent that the gifts causa mortis, aggregating $2,000, out of which was paid the expenses for the last illness and death of the decedent, amounting to $415, left undisposed of $995.34, or more than enough to satisfy the claim of the widow for her share in the personalty of the deceased. The donee of the gifts causa mortis cannot, therefore, be required to surrender any part of such gifts on account of any claim of the plaintiff on behalf of the widow. No showing has been made by the plaintiff of any debts which would require any surrender on the part of the defendant.

The complaint will, therefore, be dismissed, and an order entered discharging the receivers.